UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| GEOTAG, INC., <br><br> Plaintiff, <br><br> v. <br><br> FRONTIER COMMUNICATIONS CORPORATION, et al., <br> Defendants. | Civil Action No. 2:10-CV-00265 <br><br> Consolidated Case |

**DEFENDANTS' RESPONSE TO PLAINTIFF GEOTAG INC.'S NOTICE OF REQUEST FOR STATUS CONFERENCE ON MEDIATION ISSUES ON TUESDAY, APRIL 2**

GeoTag's "notice" unilaterally requesting a status conference to address mediation issues is unwarranted for several reasons:  (i) GeoTag is simply unhappy that no Defendant will agree to settle and wants to alter the process mid-stream; (ii) GeoTag attempts to craft a discovery motion out of its "notice" and this is not the appropriate vehicle for such a discovery motion;[1] and (iii) the Court has assigned very capable mediators and granted them broad power to address these issues obviating the need for judicial intervention.[2]  Accordingly, the Court should deny GeoTag's request for a status hearing just days from now.

---

[1] With respect to certain issues regarding the scope of damages discovery sought by GeoTag in these cases, many defendants would welcome the opportunity to address the issues through expedited briefing and hearing if the Court is so inclined.  However, Defendants assert that a proper meet-and-confer first be held to define the issues in order properly present the true disputed issues to the Court for resolution.

[2] In addition, because GeoTag never raised this issue with Defendants prior to its filing on the evening of March 28, 2013, there are logistical constraints preventing Defendants' counsel involved in the mediations, who are located across the country, from attending any hearing on such short notice.

## I.      Mediation Background

Mediations in these cases began on March 14, 2013.  To date, not a single store locator case has been resolved through this process, despite dozens of mediations.[3]  According to the general consensus of Defendants, no Defendant has come remotely close to resolving its dispute because of the unreasonable approach GeoTag has taken towards mediation.

The gap exists for largely three reasons: 1) the Defendants believe that neither the store locator nor job locator functionality infringe GeoTag's claims under the Court's Markman ruling; 2) Geotag's demands are based on no cognizable damage theory recognized by the Federal Circuit; 3) the Defendants are largely viewing settlement based on the economics of continuing to incur the expense of litigation versus settling a case that is viewed as being devoid of merit.

The parties therefore remain oceans apart from each other on the valuation of these cases and ships appear headed in opposite directions.  For instance, GeoTag's settlement demands have increased between two to nearly 60 times higher than settlement demands made in late 2012.[4]  GeoTag's current mediations demands are often hundreds of times greater than the amount Defendants spent on the accused store locator technology.  These mediation demands typically arrive two-to-three days prior a given Defendant's mediation in a one-line letter without explanation of how GeoTag amount demanded.  And, GeoTag's demands are entirely

---

[3] According to GeoTag's Notice, "GeoTag has reached a settlement in principle through the mediation process with one job locator provider."

[4] In addition to Defendants that have seen GeoTag's settlement demands increase by orders of magnitude as this litigation has progressed, a number of Defendants had never received a settlement demand from GeoTag prior to receiving the mediation demand.

inconsistent with the other settlements into which GeoTag has entered -- including settlements made earlier this year prior to the outset of the present mediation process.[5]

But this is the process GeoTag wanted and Defendants opposed, anticipating just such difficulties.  When the Court requested proposals for addressing mediations, Defendants proposed groupings in large part based on common indemnitor relationships or on the similarity of the accused functionality.  GeoTag opposed.  Even after the Court issued its Mediation Order grouping the Defendants as requested by GeoTag, Defendants requested GeoTag agree to certain realignments with respect to indemnitors/indemnitees in order to provide the best chance of successful mediation.  GeoTag again opposed.

Accordingly, the parties and the mediators have spent a tremendous amount of time and resources scheduling, coordinating, and preparing for these mediations.  Defendants' client representatives have jiggered and re-jiggered schedules throughout the end of March and April to coordinate for the convenience of all involved.  It is unclear how GeoTag's requests, even if ruled upon, could impact the immediately scheduled mediations.

In addition, the Court assigned experienced and creative mediators to these cases. Several of the mediators have mentioned the possibility of reaching out to the Court for the guidance that they deem necessary.  The Mediation Order provided the mediators with authority to address many of the issues presented by GeoTag's Notice.  To the extent the mediators deem it necessary to approach the Court with issues or proposals from their trained and neutral perspective, Defendants suggest that is the proper mechanism for addressing any of these issues.

In sum, GeoTag is simply unhappy that absolutely none of the Defendants value this case in even the same ballpark that they do.  Having recognized that, GeoTag now wants to re-define

---

[5] If the Court deems it helpful or necessary, Defendants have prepared a summary of these agreements for review *in camera*.

the rules of the mediations.  However, as described below, GeoTag's request for a status
conference will not meaningfully alter the course of the mediations or provide any greater chance
of resolution of these issues.

## II.    Indemnification Issues

GeoTag suggests in its Notice that it still needs detailed information regarding the
indemnification relationships between the parties, such as information regarding the existence of
third party providers, the extent of the third party's services, the dates of use of third party
services, and details and limits of indemnity obligations.

However, in the vast majority of instances, GeoTag already has that information --
GeoTag simply has not reviewed the materials prior to the mediations.  Most of the major
technology providers/indemnitors -- *e.g.*, Google, Microsoft and Where2GetIt -- produced long
ago the agreements between themselves and their customers, or the Defendants themselves
produced the agreements.  Those agreements contain the indemnification information that
GeoTag now claims it needs and lacks.  Those agreements also show the price paid by relevant
Defendants for the alleged store locator technology at issue here.

Most Defendants have also produced information relating to the services provided by any
provider/indemnitor (even though it remains unclear to most Defendants the scope of GeoTag's
infringement contentions).  Essentially every Defendant has made source code and database
information available, to the extent Defendants have such source code.  Accordingly, Defendants
have made available to GeoTag the very information identified in the Notice concerning the
extent of any indemnitor's services.

It is up to GeoTag to review the available information; it is not up to Defendants to do
GeoTag's work compiling all of the information for GeoTag's convenience.

GeoTag also requests that "all indemnitors or potential indemnitors be expressly made subject to the Mediation Order and required to participate in the mediation process.  Even if the Court has the power to subject non-parties to a mediation order, the mediation process is complicated enough without requiring the participation of multiple "potential" indemnitors. Moreover, as GeoTag concedes in its motion, the mediators and parties have already made arrangements for indemnitor participation in the mediation process, and there is no reason that the mediators cannot continue to do so.[6]


## III.  Damages Related Information

According to GeoTag's Notice, "GeoTag has heard from mediators that defendants complain about issues related to the damages model the GeoTag has discussed as well as GeoTag's current estimates of the amount of damages that it will seek at trial."  (Dkt. No. 552 at 4).  This is accurate: GeoTag's damages model simply flies in the face of prevailing Federal Circuit precedent.

Despite this long-standing litigation, most Defendants have not received any indication of how GeoTag would -- indeed, could -- model its damages theory to arrive at trial damages, and mediation numbers that are so high they are essentially non-starters for Defendants.  Only through the mediation process have Defendants first heard any damages theory and, truth be told, Defendants have rejected it out-of-hand because it is entirely unsupportable under well-defined Federal Circuit damages analyses.  However, Defendants do not believe that these issues should

---

[6]     For example, GeoTag and the mediators agreed on a protocol that allowed for early mediation with Oracle America, Inc., one of the job-locator indemnitors.  Oracle has participated in the mediation process, sending both in-house and outside counsel to Dallas on March 18 for a lengthy mediation session (even though Oracle is not a party to the litigation).  Other indemnitor mediations have been scheduled.

be decided through a status conference on mediation issues. Rather, Defendants agree that these issues can be properly "teed up" for the Court through a meet-and-confer with each Defendant or logical Defendant group, and then if needed a focused motion to compel.  As this process is revealing, there is no "one-size-fits-all" solution to many of the issues facing the individual Defendants in these cases.

With respect to the particular issues raised in GeoTag's Notice, the vast majority of Defendants have provided sufficient information for GeoTag to initially make settlement demands.  By way of example, GeoTag has complained that it does not know the number of locations for many Defendants.  That information is publicly available for many, if not all, Defendants.  GeoTag simply needs to do its own work to arrive at these numbers.  But further, and more importantly, that information is in the materials the vast majority of Defendants already have produced.  For instance, GeoTag has the store locator database for many Defendants and, therefore, it has at its fingertips the number of locations.  GeoTag simply needs to review the materials rather than ask the Court to Order Defendants to do GeoTag's work.

It is worth noting that GeoTag proposed the mediation groupings based on various industries, *e.g.*, restaurants, "big box" retailers, luxury goods, etc.  According to GeoTag's counsel, GeoTag's thought was that each competitor in the various industries would want to be treated the same with respect to potential settlement.  GeoTag's theory assumes that different industries have different pricing structures for the alleged store locator functionalities.  However, as GeoTag knows (or should know) from documents produced long ago, for many Defendants there are no industry differences in pricing for the store locators.  That pricing information, to the extent it exists, is in the agreements that most every Defendant so situated has produced.  Yet, this issue does not even impact many other Defendants.

### III.  Mediation Fees and Costs

#### A.      "Per Party" vs. "Per Side" Allocation Of Mediator Fees And Expenses

Defendants assert that the costs associated with this mediation process, which was put forth by GeoTag, need be borne equally by "both sides."  As discussed above, GeoTag wanted to do each of these individual mediations rather than mediate in more appropriate collective groupings.  Accordingly, GeoTag should be prepared to pay for half of the mediation costs for each party.  While not expressly stated in Appendix H of the Local Rules, Defendants assert that the requirement that "the cost for mediator's services shall be borne equally by the parties to the mediation" contemplates a two-party mediation, with each party bearing half of the cost.  The same should apply here: GeoTag pay half and Defendants pay half.   Indeed, the Court has already divided costs along these lines when the Court ordered that GeoTag on the one hand and Defendants collectively on the other each pay half of the technical advisor's fees incurred during claim construction.  (Dkt. No. 490).

#### B.      Allocation Of Costs Incurred By GeoTag As A Result Of Coordination

For many of the reasons discussed above, the logistics of the mediations are a creation of GeoTag's own making.  GeoTag's suggestion of a "good deed" is entirely self-serving and inaccurate.  GeoTag believes this is a very substantial case requiring all of the trappings that it determines are necessary; however, more than 300 Defendants have the exact opposite view and do not believe they should be forced to pay for accommodations GeoTag booked unilaterally. Defendants did not make any minimum room reservation or financial commitments -- Defendants were not even consulted by GeoTag when GeoTag made these commitments.

## IV.  Mediation Procedures.

### A.        Necessity Of Breakout Rooms.

There is no need to require every one of the 300-plus Defendants to obtain its own breakout room over and above what Defendants already have provided.  First, and perhaps most importantly, this is a logistical issue best left to the capable mediators the Court appointed, and, to Defendants knowledge, no mediator has had an issue regarding breakout rooms.  For instance, mediators have had Defendants in their own rooms (which Defendants would pay half of); other mediators have indicated that a single break out room may be sufficient for several parties mediating on the same day.  Indeed, mediators have spoken with parties quietly in the coffee shop, but that is a decision by the mediators and should remain so.  Second, GeoTag's concern about the commitment it made to the hotels is entirely GeoTag's doing, and this commitment was made unilaterally without Defendants' participation.  For instance, GeoTag notified Defendants that The Gaylord Texan Hotel requires a minimum three-day reservation for the breakout rooms.  A three-day reservation is simply not necessary for a one-day mediation session and is a waste of resources that GeoTag seeks to impose upon hundreds of Defendants.  By way of example, one Defendant's entire mediation consisted of attending a 20-minute joint presentation by GeoTag in the morning, and then approximately 15 minutes with the mediator in the mediator's room later in the morning.  The rest of the time was spent literally sitting around awaiting a call from the mediators or GeoTag.  At around 4 pm, the mediator called to dismiss the Defendant for the day without any discussion of resolution, counteroffer, or explanation of damages or liability.  It defies logic for Defendants to pay for three days for a breakout room when many of the mediations involve mere minutes of time with the mediators.

### B.      Maximum Number Of Defendants To Mediate On Any Given Day.

Like the issue above, the number of mediations on a given day should be at the discretion of the mediators; they can best determine their needs and instruct the parties accordingly.  At this point, clients and counsel have played gymnastics with their schedules to make this work -- GeoTag has no such issue.  Disrupting the schedule as set by the parties and agreed to by the mediators is not warranted here.

### C.      Necessity To Attend Full Day.

Again, the time for attendance at mediation is a mediator-driven issue. Defendants assume that all parties are adhering to the mediators plans for each mediation day. Some mediators require a joint session; some do not.  Some set a 2-3 hour block for each party's mediation; some do not.  Regardless, each mediator can and does control their schedule.  To the extent any party is not fully meeting the mediator's demand for attendance, those issues should be addressed through the mediators -- not here, in a calculated, pseudo-emergency motion styled as a "notice" on the eve of a holiday weekend.

Respectively filed on behalf of all Defendants in consolidated actions,

/s/ *Jodi Rosen Wine*
J. Thad Heartfield
Texas State Bar No. 09346800
M. Dru Montgomery
Texas Bar No. 24010800
THE HEARTFIELD LAW FIRM
2195 Dowlen Road
Beaumont, Texas 77706
(409) 866-3318 (Telephone)
(409) 866-5789 (Facsimile)
thad@jth-law.com
dru@jth-law.com

Jodi Rosen Wine
Illinois State Bar No. 6209883
Russell J. Genet
Illinois State Bar No. 6255982

NIXON PEABODY, LLP
300 S. Riverside Plaza, 16th Floor
Chicago, IL 60606
Telephone: 312-425-3900
Fax:  312-425-3909
jwine@nixonpeabody.com
rgenet@nixonpeabody.com

Jason Kravitz
Massachusetts State Bar No. 565904
NIXON PEABODY LLP
100 Summer Street
Boston, MA 02110-2131
Telephone: 617-345-1000
Fax:  617-345-1300
jkravitz@nixonpeabody.com

**COUNSEL FOR DEFENDANTS
ACADEMY LTD., ANN INC., AT&T SERVICES, INC.,
AT&T MOBILITY LLC, ALBERTSONS INC,
ALBERTSONS LLC, BANANA REPUBLIC LLC,
BARNES & NOBLE, INC., BRINKER INTERNATIONAL,
THE CHEESECAKE FACTORY, TCF CO. LLC, DEERE & CO.,
FIFTH THIRD BANK, THE GAP, INC., OLD NAVY LLC,
HALLMARK CARDS, INC., HERMAN MILLER, INC.,
MACY'S INC., NORDSTROM INC., PANERA LLC,
PANERA BREAD COMPANY, PETCO ANIMAL SUPPLIES INC.,
 PETCO ANIMAL SUPPLIES STORES, INC.,
STARBUCKS CORP., TARGET CORP., VALSPAR CORP.,
VF CORPORATION, SEVEN FOR ALL MANKIND LLC,
NAUTICA RETAIL USA, INC., THE WESTERN UNION
COMPANY, WESTERN UNION HOLDINGS, INC.,  CLARK
EQUIPMENT COMPANY d/b/a BOBCAT COMPANY, LEVI
STRAUSS & CO., THE SCOTTS COMPANY, GROUPE
DYNAMITE, INC., CROCS INC., LUXOTTICA RETAIL NORTH
AMERICA INC.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who have consented to electronic service are being served with a copy of this document on this 1st day of April, 2013 via the Court's CM/ECF system per Local Rule CV-5(a)(3).


/s/ *Jodi Rosen Wine*